13 F.3d 711
 40 Fed. R. Evid. Serv. 177
 UNITED STATES of America
v.
James PRICE, a/k/a "Squeezie," James Price, Appellant.
UNITED STATES of America
v.
Reginald REAVES, a/k/a "Reggie," a/k/a "R," Reginald Reaves,
Appellant.
UNITED STATES of America
v.
Joseph COBB, a/k/a "Gump," Appellant.
UNITED STATES of America
v.
Leroy JACKSON, a/k/a "Skip," Leroy Jackson, Appellant.
UNITED STATES of America
v.
Darrell REAVES, Appellant.
UNITED STATES of America
v.
Anthony LONG, a/k/a "T.L.," a/k/a "Tony," Anthony Long, Appellant.
UNITED STATES of America
v.
Michael WILLIAMS, Appellant.
 Nos. 92-1888, 92-1902, 92-1903, 93-1069, 93-1094, 93-1113
and 93-1160.
 United States Court of Appeals, Third Circuit.
 Argued Dec. 14, 1993.
Decided Jan. 10, 1994.
Sur Petition for Rehearing in No. 93-1069 Feb. 4, 1994.
Sur Petition for Panel Rehearing in No. 93-1160 Feb. 16, 1994.
Sur Petition for Panel Rehearing in No. 93-1094 March 11, 1994.
 
 William J. Brennan (argued), Philadelphia, PA, for appellant James Price.
 Edward V. Schulgen (argued), Philadelphia, PA, for appellant Reginald Reaves.
 Timothy P. Booker (argued), Philadelphia, PA, for appellant Joseph Cobb.
 Peter Goldberger (argued), Pamela A. Wilk, Law Office of Peter Goldberger, Philadelphia, PA, for appellant Leroy Jackson.
 Hope C. Lefeber (argued), Philadelphia, PA, for appellant Darrell Reaves.
 Warren R. Hamilton (argued), Philadelphia, PA, for appellant Anthony Long.
 Stephen P. Patrizio (argued), Dranoff & Patrizio, Philadelphia, PA, for appellant Michael Williams.
 Michael J. Rotko, U.S. Atty., Joel M. Friedman, Allison D. Burroughs, Abigail R. Simkus, Asst. U.S. Attys., E.D. PA., Joseph C. Wyderko (argued), Nina Goodman, U.S. Dept. of Justice, Washington, DC, for appellee U.S.
 Before: SLOVITER, Chief Judge, GREENBERG and ROTH, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 
 1
 Defendants James Price, Reginald Reaves, Joseph Cobb, Leroy Jackson, Darrell Reaves, Anthony Long and Michael Williams appeal from judgments of conviction and sentence following a jury trial on several drug-related charges. Defendants make, in combination, fifteen separate claims of error which they argue require reversal of their convictions and a new trial. All the defendants, except Reginald Reaves, also challenge the court's sentencing determinations. We review the evidence in the light most favorable to the verdict winner, in this case the government. See United States v. Ofchinick, 883 F.2d 1172, 1177 (3d Cir.1989), cert. denied, 493 U.S. 1034, 110 S.Ct. 753, 107 L.Ed.2d 769 (1990).
 
 I.
 INTRODUCTION
 
 2
 On October 2, 1991, a grand jury in the United States District Court for the Eastern District of Pennsylvania returned a thirty-two count indictment charging the defendants, along with nineteen others, with conspiracy to distribute cocaine, crack cocaine, and heroin between late 1985 and September 1991. The indictment alleged that all defendants were members of a criminal organization known as the Junior Black Mafia ("the JBM"), which sold and distributed for resale large amounts of cocaine and heroin in the Philadelphia area. Three defendants, Jackson, Reginald Reaves and Williams, were also charged on substantive offenses of distribution of cocaine or cocaine base in separate instances.
 
 
 3
 The district court ordered the trial of the three leaders, Aaron Jones, Bryan Thornton, and Bernard Fields, to be severed from the other defendants', and then ordered the remaining defendants to be tried in two separate trials. These are the direct appeals from the second trial. Nine defendants who were to be tried in a third trial all pled guilty pursuant to plea bargains, as did five others. This Court has previously affirmed the convictions of the three conspiracy leaders, see United States v. Thornton, 1 F.3d 149 (3d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993), and has affirmed in unreported opinions the convictions and sentences of two other conspiracy members who pled guilty. See United States v. Perdue, 16 F.3d 406 (3d Cir.1993); United States v. Davis, 16 F.3d 405 (3d Cir.1993).
 
 
 4
 At the sixteen-day jury trial involving these seven appellants, the government introduced a substantial amount of evidence in support of its charges against the defendants, including the testimony of eight cooperating witnesses who were members of or who had had direct dealings with the JBM, approximately fifty wiretapped or consensually recorded conversations concerning members of the JBM, and physical evidence, including documents, photographs, drugs, weapons, and drug-related paraphernalia. This evidence, similar to that introduced in the earlier Thornton trial, demonstrated (1) the numerous sources from which the JBM purchased and then distributed in the Philadelphia area over 1,000 kilograms of cocaine and lesser amounts of heroin during the period of time alleged in the indictment; (2) the administration of the JBM by Aaron Jones, Bryan Thornton, and Bernard Fields; (3) the division of the organization into squads which controlled the distribution of drugs in various sections of Philadelphia; and (4) the violent tactics used by members of the JBM to expand the organization's territory and to gain greater control of the drug-trafficking business in Philadelphia. More specifically, the evidence in this trial demonstrated that (1) Reginald Reaves was a squad leader; (2) his brother Darrell Reaves was his "right-hand man"; (3) Long was a member of Mark Casey's squad; (4) Price worked as a courier and enforcer for Jones; (5) Jackson dealt in drugs, facilitated the JBM's meetings and advised the JBM in general, and Jones in particular; (6) Cobb facilitated drug purchases for the JBM, and acted as a courier and enforcer; and (7) Williams was associated with members of the JBM and sold drugs. From time to time, there was a shift in their various roles and responsibilities.
 
 
 5
 The jury found all the defendants guilty of conspiracy to distribute and to possess with intent to distribute cocaine and heroin in violation of 21 U.S.C. Sec. 846 (1988). In addition, Jackson was convicted on one count of distribution of cocaine base, and Reginald Reaves was convicted on one count of distribution of cocaine, both in violation of 21 U.S.C. Sec. 841(a)(1) (1988). Williams was acquitted on one count of distribution of cocaine.
 
 
 6
 Defendants Price, Cobb, Jackson, Darrell Reaves and Long were each sentenced under the United States Sentencing Guidelines to 360 months' imprisonment plus five years' supervised release. Reginald Reaves was sentenced to life imprisonment, to be followed by supervised release for life. Williams was sentenced to 292 months' imprisonment to be followed by five years of supervised release.
 
 II.
 DISCUSSION
 
 7
 On appeal, each defendant argues that errors during the trial require a reversal of his conviction. Additionally, all the defendants but Reginald Reaves challenge the length of their sentences. We will address the defendants' allegations of error in the order in which they were alleged to have occurred,[1] and then review the sentencing of each defendant separately.
 
 A.
 Double Jeopardy
 
 8
 Price argues that he should never have been tried for conspiracy because he had previously pled guilty and been punished for one of the overt acts on which his participation in the conspiracy was based. He claims his conviction for conspiracy to distribute cocaine is a violation of the Double Jeopardy Clause. We review this "legal issue of constitutional dimensions" de novo. United States v. Ciancaglini, 858 F.2d 923, 926 (3d Cir.1988). We rejected an argument similar to Price's in United States v. Esposito, 912 F.2d 60, 65 (3d Cir.1990), cert. denied, 498 U.S. 1075, 111 S.Ct. 806, 112 L.Ed.2d 1032 (1991), where we referred to the "well-established principle that collective criminal agreement is a separate criminal offense from individual delicts." The Supreme Court has recently reiterated the principle that the "prosecution of a defendant for conspiracy, where certain of the overt acts relied upon by the Government are based on substantive offenses for which the defendant has been previously convicted, does not violate the Double Jeopardy Clause." United States v. Felix, --- U.S. ----, ----, 112 S.Ct. 1377, 1380, 118 L.Ed.2d 25 (1992). We therefore reject this claim.
 
 B.
 Joinder and Severance
 
 9
 Cobb argues that it was error for the district court to divide into three trials the 26 members of the conspiracy who had been jointly indicted, and that when that was done he was improperly joined with his six co-defendants. We review the joinder of two or more defendants under Fed.R.Crim.P. 8(b) de novo whereas rulings on a motion for severance under Fed.R.Crim.P. 14 are reviewed for abuse of discretion. See United States v. Eufrasio, 935 F.2d 553, 567-68 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991).
 
 
 10
 Cobb's claim that all 26 indicted co-conspirators should have been tried together is unusual. Frequently, a defendant contends that trial with all his other alleged co-conspirators would be prejudicial. Indeed, that was Cobb's position in the district court. When the government indicts a large number of defendants on massive conspiracy allegations, it is the responsibility of the district court to consider various measures, including possible severance, that will make the trial manageable and protect the rights of the defendants to individualized consideration. We have stated that a trial court should "balance the public interest in joint trials against the possibility of prejudice inherent in the joinder of defendants." Eufrasio, 935 F.2d at 568. Ordinarily, judicial and prosecutorial resources will be conserved by a joint trial. However, in this case the district court determined that a joint trial of all defendants would be "potentially unwieldy, unmanageable, and confusing." S.App. at 12. The court found that there would be a "significant danger of 'spillover' of evidence from the government's case against the major participants in the conspiracy to the minor ones," and that there would be no conservation of judicial or prosecutorial resources. S.App. at 12-13. In view of these findings, we conclude that the court's decision to sever the co-defendants was not an abuse of discretion.
 
 
 11
 Cobb next argues that if the defendants were not to be tried en masse, his motion for a separate trial should have been granted. Inasmuch as this is a discretionary decision, a defendant has the heavy burden to "demonstrate clear and substantial prejudice resulting in a manifestly unfair trial." Eufrasio, 935 F.2d at 568 (quotation and emphasis omitted). The Supreme Court has recently held that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, --- U.S. ----, ----, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993), see also United States v. Console, 13 F.3d 641, 655-56 (3d Cir.1993).
 
 
 12
 The district court in this case concluded before trial that severance of Cobb from the six co-defendants was not required because Cobb had failed to show specifically how joinder would be prejudicial.[2] The record in this case demonstrates that he suffered no such prejudice. Most of the evidence presented at the trial concerned drug transactions that occurred while Cobb was an active participant in the JBM. Although Cobb argues that because he was denominated an "enforcer" much of the testimony at trial relating to drug sales and distribution prejudiced him, we note that evidence at trial indicated that Cobb was a courier and a supplier as well. Even if the evidence had shown that he was solely an agent of violence, we stated in Eufrasio that "[p]rejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant." 935 F.2d at 968. We find no abuse of discretion in the court's denying Cobb's motion for a separate trial.
 
 
 13
 Cobb's final argument in this vein is that, in any event, the court erred in joining him with these six specific co-defendants. However, the Supreme Court has noted that joinder under Rule 8 is proper when an indictment "charge[s] all the defendants with one overall count of conspiracy...." United States v. Lane, 474 U.S. 438, 447, 106 S.Ct. 725, 730, 88 L.Ed.2d 814 (1986); see also Eufrasio, 935 F.2d at 567 ("As long as the crimes charged are allegedly a single series of acts or transactions, separate trials are not required."). In this case, all the defendants were charged with participation in a single overarching drug conspiracy beginning in late 1985 and ending in September 1991. That is sufficient basis for joining these defendants in a single trial. See Thornton, 1 F.3d at 153 ("[J]oinder would not be improper merely because a defendant did not participate in every act alleged in furtherance of the overarching conspiracy.").
 
 C.
 Admission of Evidence at Trial
 1.
 Admission of Prior Arrest
 
 14
 Price contends that the district court erred in admitting evidence that he was previously arrested for possessing a gun. A district court's decision to admit or exclude evidence under the Federal Rules of Evidence is reviewed for abuse of discretion. See In re Merritt Logan, Inc., 901 F.2d 349, 359 (3d Cir.1990).
 
 
 15
 Rule 404(b) "protects against the introduction of extrinsic act evidence when that evidence is offered solely to prove character." Huddleston v. United States, 485 U.S. 681, 687, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771 (1988). The testimony of the arresting officer at trial revealed that on October 26, 1988, Price was seen engaging in what the officer thought was a narcotics transaction and that when the plain-clothed officer approached, Price pulled a gun. When the officer identified himself, Price dropped the gun and was arrested. The gun found on Price was then introduced into evidence. On cross-examination by Price's attorney, the officer conceded that the weapons charges were later dropped.
 
 
 16
 Price argues that neither the testimony nor the gun should have been admitted under Rule 404(b) because it was not probative of his involvement in the conspiracy and was introduced merely to demonstrate his propensity to do bad acts. While we do not suggest that every previous weapons charge is probative in every drug conspiracy case, cf. United States v. Zarintash, 736 F.2d 66, 71-72 (3d Cir.1984) (where defendants were alleged to be drug buyers, large amount of cash seized a year after end of alleged conspiracy not probative of activities during conspiracy), we have previously noted that possession of weapons is "highly probative of the large scale of a narcotics distribution conspiracy and the type of protection the conspirators felt they needed to protect their operation." United States v. Pungitore, 910 F.2d 1084, 1152 (3d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991) (citing United States v. Adams, 759 F.2d 1099, 1108-09 (3d Cir.), cert. denied, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985)) (quotations omitted); see also United States v. Martinez, 938 F.2d 1078, 1083-84 (10th Cir.1991) (surveying cases admitting weapons as "tools of the trade"). The Price gun incident took place during the duration of the conspiracy, and the indictment alleged that "members of the JBM would and did carry semi-automatic handguns and other firearms in order to protect themselves and their drug business and to threaten and inflict violence upon rival drug dealers." C.App. at 95. This provided a sufficient reason, independent of character, for the admission of the evidence and therefore the court did not abuse its discretion.
 
 
 17
 Price also argues that even if probative, the admission of the evidence of gun possession should have been barred under Rule 403 because its prejudicial impact outweighed its probative value. The district court rejected this claim, noting, inter alia, that Price had adequate notice that the prior arrest might be used. C.App. at 704 ("I can't conscientiously say [that the probative value is] outweighed by the risk of unfair prejudice when you've had the information for that long"). Although unfair surprise is a factor to be considered under Rule 403, absence of surprise is not sufficient to offset unfair prejudice. However, Price has been unable to articulate any prejudice stemming from the evidence and claims merely that evidence of the gun might have encouraged the jury to decide against him on the basis of the emotional impact of the prior arrest on weapons charges. After reviewing the testimony, we are not persuaded that the evidence would have had that effect and we therefore conclude that the district court did not abuse its discretion.
 
 2.
 Admission of Physical Evidence
 
 18
 Price also contends that the district court erred in denying his motion to suppress fourteen kilograms of cocaine that were seized from him on December 12, 1988. On that day, Price was arrested when Philadelphia police officers found the cocaine in a duffel bag he was carrying. As a result, he was indicted for possession with intent to distribute cocaine in violation of 21 U.S.C. Sec. 841(a)(1). After Price's motion to suppress the cocaine on the ground that it was seized in violation of the Fourth Amendment was denied, he entered a conditional guilty plea pursuant to Fed.R.Crim.P. 11(a)(2) and was sentenced to ten years' imprisonment. On appeal, we affirmed the district court's denial of Price's motion to suppress. See United States v. Price, 888 F.2d 1383 (3d Cir.1989) (unreported judgment order).
 
 
 19
 In the present case, the prosecution sought to introduce as evidence the same fourteen kilograms of cocaine. Price filed a motion in limine to suppress the cocaine, renewing his contention that it was seized in violation of the Fourth Amendment. After the district court learned that a district judge in the same court had denied the motion to suppress in the earlier case, the court ruled, "All right. Well, for the same reasons then, the motion to suppress is denied again." C.App. at 706.
 
 
 20
 The government argues that the district court correctly ruled that Price was precluded from relitigating the merits of his motion to suppress.[3] We note that this court has never held that collateral estoppel can be invoked by the government against a defendant in a criminal trial, and that other Courts of Appeals are divided on this issue. Compare United States v. Harnage, 976 F.2d 633, 635 (11th Cir.1992) ("We are not convinced that allowing the government to bar a defendant from relitigating an unfavorable determination of facts in a prior proceeding would serve the original goal of collateral estoppel--judicial economy.") with United States v. Rosenberger, 872 F.2d 240, 241-42 (8th Cir.1989) (defendant collaterally estopped from moving to suppress evidence previously found to be legally obtained) and United States v. Thoresen, 428 F.2d 654, 666-67 (9th Cir.1970) (same). The application of collateral estoppel to criminal defendants raises difficult due process questions. See United States v. Hamilton, 931 F.2d 1046, 1053 n. 1 (5th Cir.1991); Allan D. Vestal, Issue Preclusion and Criminal Prosecution, 65 Iowa L.Rev. 281, 312-21 (1980). We need not decide that issue in this case because, even assuming arguendo that collateral estoppel did not apply and that the district court would have suppressed the evidence, the introduction of the cocaine would not be a basis to overturn the conviction.
 
 
 21
 If unconstitutionally obtained evidence is erroneously admitted at trial, a conviction based on that evidence will not be vacated if the prosecution can show that "the evidence is so overwhelming that it is beyond a reasonable doubt that the verdict would have been the same without the improper evidence." United States v. Pavelko, 992 F.2d 32, 35 (3d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 272, 126 L.Ed.2d 223 (1993). The prosecution would clearly meet its burden in this case. There is substantial evidence, in both quality and quantity, which linked Price to the JBM conspiracy. Several witnesses testified that Price delivered cocaine to them for distribution, that he wore a JBM ring, and that he worked with other members of the JBM. Therefore, we conclude that the outcome of this case would not have been different had the district court rejected the evidence.
 
 3.
 Admission of Taped Conversations
 
 22
 Cobb argues that the tape recordings of conversations between Cobb and other JBM members should have been inadmissible because they were hearsay. Patently, Cobb's own statements during those conversations were not hearsay. See Fed.R.Evid. 801(d)(2)(A). The statements of other JBM members were admissible because they were statements of Cobb's co-conspirators made to Cobb during the course and in furtherance of the conspiracy. See Fed.R.Evid. 801(d)(2)(E).
 
 
 23
 Cobb also argues that the court erred in allowing unredacted tape recordings of Cobb's conversations that contained many racial epithets which were "extremely insulting and inflammatory" to members of the jury. Brief of Appellant Cobb at 28. On the tape specifically objected to, Cobb refers to members of a rival gang as "niggers." The court noted the existence of the racial epithet but overruled the objection. Cobb argues that the prejudicial effect of this evidence outweighed its probative value because it did not prove the existence of the conspiracy.
 
 
 24
 After reviewing the transcript, and noting that this particular conversation demonstrated Cobb's knowledge of the JBM, we agree with the government that it would have been virtually impossible to redact this or the other conversations without altering their substance. Additionally, although the term was used a number of times by the other conversation participants, Cobb himself only used it once. Inasmuch as defendant Williams was acquitted of one charge despite being heard on three recordings with such language, it appears that the jury was not overly concerned about the language to which Cobb alludes. Thus, we hold that the district court did not abuse its discretion in overruling Cobb's objections.
 
 4.
 Witnesses' Trial Testimony
 
 25
 Cobb argues that a statement by a witness constituted impermissible comment on Cobb's failure to testify and that a statement by another witness was an impermissible reference to other crimes Cobb committed. Neither comment was objected to contemporaneously, and we therefore review these claims for plain error. See United States v. Shirk, 981 F.2d 1382, 1392 (3d Cir.1992), cert. granted and judgment vacated, --- U.S. ----, 114 S.Ct. 873, 127 L.Ed.2d 70 (1994).
 
 
 26
 The first alleged error occurred after Rodney Carson testified that he had given Cobb two ounces of cocaine. On cross-examination, Cobb's attorney commented that the only people who could seem to corroborate Carson's testimony "are dead people." Tr.Trans. 6/22/92 at 105. He then asked Carson who could corroborate his testimony, and Carson replied "Your client, sir." C.App. at 189. Carson later identified two other JBM members who could. Cobb argues that the court should have declared a mistrial sua sponte after that answer. We believe it is unlikely that Carson's response can be viewed as a comment on Cobb's failure to testify. In any event, it was elicited by the defendant's own questions, and thus falls outside of the principle established in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), that precludes a court or prosecutor from commenting (and presumably also eliciting a witness' comment) on the defendant's failure to testify. Cobb cites no case extending the Griffin prohibition to this situation, and it follows that this does not rise to the level of plain error.
 
 
 27
 The second error alleged occurred at the beginning of Cobb's cross-examination of Christopher Anderson when, in response to the question whether he was "well rested," Anderson responded "[w]ell, you can say--I mean ever since the scene in New York--I would recommend to your client not to go there." C.App. at 352.[4] Whatever prompted the witness to make this statement, we agree with the government that this unintelligible answer was unlikely to have suggested to the jury that Cobb had engaged in other crimes. Failure of the court to sua sponte strike it or declare a mistrial was thus not plain error.
 
 D.
 Brady Violations
 1.
 DEA Payments to Government Witnesses
 
 28
 Jackson and Cobb contend that the government's failure to disclose until after trial that the Drug Enforcement Administration (DEA) had made payments to two cooperating government witnesses, Dwight Sutton and Darrell Jamison, constitutes a violation of the principles set forth in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and requires a new trial. This is precisely the situation we discussed in Thornton, 1 F.3d at 157-59. Sutton and Jamison had also testified against those defendants, and the government only belatedly advised counsel that they had received payments from the DEA. We did not there, and we do not here, condone the government's conduct, whether wholly attributable to the DEA or to a lack of communication between the separate divisions of the Justice Department.
 
 
 29
 As we noted in Thornton, in considering the defendants' motion for a new trial pursuant to Fed.R.Crim.P. 33 on the ground of newly discovered evidence,[5] the court must decide whether there is a reasonable probability that the result would have been different had the evidence been disclosed. Id.; see Pennsylvania v. Ritchie, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987). The district court denied the motions of Jackson and Cobb, concluding, after examining in detail the evidence against each, that "no reasonable probability exists that the results of the trial would have been different had the government produced the documents at issue before trial." C.App. at 631 (Jackson), S.App. at 97 (Cobb). For Jackson, the court stated that "the testimony by Sutton and Jamison was not critical to the government's case; and the evidence of the DEA payments to Sutton and Jamison was not material." C.App. at 628. Specifically, the district court found that Sutton did not mention Jackson's name. Although Jamison testified as to the substantive drug charge for which Jackson was convicted, his testimony was cumulative to that of DEA Agent Phillip Davis, whose testimony "thoroughly covered the transaction." C.App. at 629.
 
 
 30
 As to Jamison's testimony regarding Jackson's involvement in the JBM drug conspiracy, Jamison testified that he talked with Jackson about JBM members and that members of the JBM met at Jackson's store. Even if, as Jackson argues, he was not present at the meetings, the jury reasonably could have viewed his awareness of such meetings as knowledge of the conspiracy and the consensual use of his property for that purpose as support of its aims. In any event, the court noted the substantial amount of evidence against Jackson, including two incriminating consensually recorded conversations with William Mead, demonstrating Jackson's involvement with the JBM. The court also referred to the testimony of numerous other government witnesses and to physical and documentary evidence which evidenced his participation in numerous drug transactions. Finally, the court noted that Jackson, as well as all the other defendants, had been provided with Jamison's plea agreement and the fact of Sutton's immunity, and had used that evidence to cross-examine both witnesses as to the benefits they hoped to receive as a result of cooperating with the government. Thus, the court concluded that there was no reasonable probability that the outcome of the trial would have been different had the DEA payments been disclosed.
 
 
 31
 Similarly, regarding Cobb, the court found that "Sutton did not mention Cobb's name because he did not know Cobb." S.App. at 95. The court characterized Jamison's testimony against Cobb as "very limited." S.App. at 96. Jamison did not mention Cobb until Cobb's attorney cross-examined him, when he said he knew him and had one unrecorded conversation with him. On redirect, Jamison testified that he knew Cobb was a member of the JBM. On recross, Jamison said he never had any drug dealing with Cobb and that he did not remember ever seeing Cobb with a gun. The court found that the "volume of other evidence against the defendant was overwhelming. Confidence in the outcome is not undermined by the failure to disclose the marginal information of which Defendant complains." S.App. at 97-98.
 
 
 32
 In considering a district court's ruling on a motion for a new trial based on the failure to disclose Brady materials, "we will conduct a de novo review of the district court's conclusions of law as well as a 'clearly erroneous' review of any findings of fact where appropriate." United States v. Perdomo, 929 F.2d 967, 969 (3d Cir.1991). Where the district court applies the correct legal standard, its "weighing of the evidence merits deference from the Court of Appeals, especially given the difficulty inherent in measuring the effect of a non-disclosure on the course of a lengthy trial covering many witnesses and exhibits." United States v. Pflaumer, 774 F.2d 1224, 1230 (3d Cir.1985) (citations omitted), cert. denied, 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986).
 
 
 33
 Jackson and Cobb raise the same arguments on appeal that they made before the district court. Here, as we found in Thornton, the district court's factual findings are amply supported by the record. It follows that the government's failure to disclose the information does not require a new trial for either Jackson or Cobb.2.
 
 Prior Consistent Witness Statements
 
 34
 Long claims that he is entitled to a new trial because the government failed to specifically affirm or deny its witnesses' testimony that he had made previous consistent statements to government investigators. At trial, Rodney Carson testified on cross-examination that he had seen Long carry a gun and that he had told this to authorities previously. Later, he testified that he had seen Long at JBM meetings and that he had told this to authorities previously. On both occasions, Long's attorney, noting that he had been given nothing that showed that Carson had, in fact, told this to the authorities, asked the court to order the government to produce any documentation of the previous conversations. In the first instance, the prosecutor responded that "[a]ll appropriate discovery has been furnished" but that she did not know whether there was a report of Carson testifying that Long carried a gun. C.App. at 158. In the second instance, she affirmed that "the Government produced all the statements of [Carson] in discovery." C.App. at 179.
 
 
 35
 We agree with the government that the Brady principles are not implicated here. Brady requires the government officials to disclose exculpatory material. If there had been a prior consistent statement by Carson it would not be exculpatory. The government has already placed on record that it produced all of Carson's prior recorded statements as required by the Jencks Act, 18 U.S.C. Sec. 3500. It has no obligation under Brady or otherwise to do any more.
 
 E.
 Judge's Conduct During Trial
 
 36
 Reginald Reaves confines his challenge to his conviction to the claim that the judge's conduct during the course of the trial tainted the fairness of the proceedings. The statements Reginald Reaves relies upon fall into two basic categories: those suggesting that defendants' attorneys were expending too much time on cross-examination and those reacting to the failure of the defense counsel to accept the court's rulings. Of course, due process requires that a trial judge's actions "never reach the point where it appears clear to the jury that the court believes the accused is guilty." United States v. Nobel, 696 F.2d 231, 237 (3d Cir.1982) (quotations omitted), cert. denied, 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983). However, due process also "requires that the trial judge ... control a trial so that it is fair and orderly." Id. Moreover, a judge has an obligation to eliminate "unjustifiable expense and delay." Fed.R.Crim.Pro. 2; see also Fed.R.Evid. 403 (relevant evidence may be excluded if it leads to "undue delay, waste of time, or needless presentation of cumulative evidence").
 
 
 37
 In balancing these competing values, we must determine whether "the judge's role los[t] its color of neutrality and tend[ed] to accentuate and emphasize the prosecution's case." United States v. Wilensky, 757 F.2d 594, 598 (3d Cir.1985) (quoting United States v. Bland, 697 F.2d 262, 265 (8th Cir.1983)). In a multiple-defendant conspiracy trial spanning four weeks, in which defense counsel approached their tasks in a spirited manner, it is not surprising that the court occasionally felt the need to remind individual attorneys of the time limitations inherent in such a proceeding.[6] Unlike the cases relied upon by Reginald Reaves, there is no suggestion in this case that the judge inappropriately participated in the questioning of witnesses. Moreover, the judge charged the jury that they were not to rely on their perception of his beliefs.[7] After reviewing the record, we conclude that the conduct of the trial judge in this case did not overstep the bounds of prudent judicial conduct.
 
 F.
 Jury Instructions
 
 38
 We turn next to Cobb's claims that the court's initial charge was erroneous. We review de novo the legal sufficiency of jury instructions to which a defendant objected, "but so long as the court properly articulated the relevant legal criteria we review the particular language used on an abuse of discretion standard." United States v. Pelullo, 964 F.2d 193, 215 n. 21 (3d Cir.1992). In the absence of an objection, we review for plain error. See United States v. Santos, 932 F.2d 244, 251 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 592, 116 L.Ed.2d 617 (1991). Plain errors are those that "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." United States v. Young, 470 U.S. 1, 16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). It is of some relevance that the Supreme Court has predicted that "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).
 
 1.
 Manner of Instruction
 
 39
 Cobb contends that the instructions were rambling or confusing. Since he failed to raise this objection below, we review for plain error. We must review the instructions not " 'in artificial isolation, but ... in the context of the overall charge.' " United States v. Park, 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975) (quoting Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973)). In its attempt to make the conspiracy elements comprehensible to the jury, the court repeated the requirements a number of times, avoiding legal "jargon" whenever possible. Cobb's criticism is unpersuasive. Had he accurately quoted the instruction he cites as the primary example of a "clearly rambling" instruction, its meaning would have been evident.[8]
 
 2.
 Elements of a Conspiracy
 
 40
 We also see no error in the court's instructions as to the elements of a conspiracy and the distinction between single and multiple conspiracies. Thus, for example, the court stated:
 
 
 41
 The Government has to prove that in order to make out its conspiracy charge that there was an agreement for an illegal purpose, namely, to distribute or possess with intent to distribute the cocaine and the heroin; that that conspiracy was willfully formed and was existing on or about the time alleged in the indictment and that each of the defendants willfully became a member of the conspiracy with the intent of furthering its unlawful purpose either with respect to the cocaine or with respect to the heroin or both.
 
 
 42
 C.App. at 367.
 
 
 43
 This Court has determined, contrary to Cobb's suggestion, that an overt act is not a necessary element for a violation of 21 U.S.C. Sec. 846. See United States v. Bey, 736 F.2d 891, 893-95 (3d Cir.1984). And while the district court did not dwell on what constituted "multiple conspiracies," it emphatically explained that the jury had to find a single conspiracy. See C.App. at 370 ("To establish the case to put it simply, the Government has to prove a single conspiracy. Multiple conspiracies won't do."). When the jury asked for reinstruction on the definition of conspiracy, the court reiterated that the "Government has to show the single conspiracy alleged in the indictment," C.App. at 405, and it went on to discuss the requirements of a "single conspiracy," using the phrase three more times. See C.App. at 405-07. There was no error.
 
 3.
 Hung Jury
 
 44
 Cobb argues that the court was required to instruct the jury that it could be a hung jury, a claim we review for plain error because it was not raised in the district court. There may be occasions where such an instruction might be necessary, such as in conjunction with the modified Allen instruction prescribed in United States v. Fioravanti, 412 F.2d 407, 420 n. 32 (3d Cir.), cert. denied, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969). This is not such an occasion. Cf. United States v. Arpan, 887 F.2d 873, 876-877 (8th Cir.1989) (en banc). The mere absence of such an instruction does not in and of itself suggest coercion. None of the court's subsequent instructions in response to the jury's questions can be described as coercing, or even encouraging, the jury to reach a verdict. There is no evidence that the jury was deadlocked; rather, the jurors' questions suggest a narrowing of the areas of uncertainty among themselves, ultimately resulting in both convictions and an acquittal. There was no plain error in the failure to give such an instruction under these circumstances.
 
 G.
 Supplemental Jury Instructions
 
 45
 Darrell Reaves and Williams claim the convictions should be overturned because the court erroneously responded to the jury's three questions. The first question sought a "review of the definitions of conspiracy." C.App. at 412. The second asked the court to "explain as specifically as possible the scope of the law regarding 'intent' as it applies to conspiracy" and to provide an "example." C.App. at 435. The third asked the court to "define voluntary participation," and asked whether "mere words that suggest intent to participate or are actions necessary to prove participation?" C.App. at 436.
 
 1.
 Burden of Proof
 
 46
 Darrell Reaves claims that the court's responses to the jury's questions reduced the government's burden of proof because the court failed to instruct the jury in response that the government had to prove guilt beyond a reasonable doubt. In fact, the court referred to the reasonable doubt standard twice in responding to the first question, see C.App. at 404, 405, and opened its remarks to the second question by describing the reasonable doubt burden, see C.App. at 413. In addition, the court mentioned the beyond a reasonable doubt standard at least 15 times in its initial jury instruction. The failure of the judge to mention the reasonable doubt standard in response to the last question, 15 minutes after he finished answering the second question, was not error.
 
 
 47
 Darrell Reaves next argues that despite the repetition of the reasonable doubt standard, the court's subsequent responses nullified that oft-repeated instruction. In response to the first question, the judge stated that "[p]roof of a conspiracy is very seldom subject to proof by direct evidence and that's why I say you may rely on circumstantial evidence. That means you may make reasonable and logical inferences that the participants in a criminal venture could not have carried on the venture except as the result of a preconceived scheme to distribute the drugs in the community." C.App. at 408. This is a near verbatim reiteration of what the court had originally charged. See C.App. at 372. Darrell Reaves claims for the first time on appeal that this instruction impermissibly establishes an inference of guilt. However, the court undoubtedly based this instruction on our holding in United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir.), cert. denied, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986), that "the existence of a conspiracy can be inferred 'from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding.' " (quoting United States v. Ellis, 595 F.2d 154, 160 (3d Cir.), cert. denied, 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979)). There was no error here.
 
 
 48
 Darrell Reaves also claims that the court erred in instructing the jury in response to the second question that "[e]ither there's evidence which satisfies you with regard to each defendant, there's not evidence to satisfy you with regard to each defendant or a particular defendant." C.App. at 415. Taken in isolation, this comment could suggest that in weighing the evidence the government did not bear the burden of proof. However, read in context, this comment is simply reminding the jury that it, rather than the court, had the responsibility to make independent factual determinations about the guilt of each defendant.[9] This was not plain error.
 
 2.
 Mere Words
 
 49
 There is more substance to the claim of Darrell Reaves and Williams that the court erred in responding to the jury's question "Do mere words that suggest intent to participate or are actions necessary to prove participation?" [sic].
 
 
 50
 The evidence in this case suggests a paradigmatic "spokes of the wheel" conspiracy as described in Kotteakos v. United States, 328 U.S. 750, 755, 66 S.Ct. 1239, 1242, 90 L.Ed. 1557 (1946). In such a situation, one central person or a core group of persons arranges for securing drugs which are then supplied to a wide-ranging cocaine distribution operation, such as was proved in United States v. Theodoropoulos, 866 F.2d 587, 593 (3d Cir.), mandamus denied, 489 U.S. 1009, 109 S.Ct. 1179, 103 L.Ed.2d 246 (1989).
 
 
 51
 In answering the jury's question the district court provided two examples. In the first example, the court explained that words between two boys who learned of a conspiracy and wanted to be part of it were not sufficient to make them conspirators because "they haven't participated in the ring." C.App. at 420.
 
 
 52
 In the second example, the court told the jury to assume the existence of a drug ring and that a hypothetical Mr. Smith learns there is such a ring. Mr. Smith approaches a member of the ring and asks "How much?" The member answers "$3,000.00 an onion."[10] Mr. Smith responds "It's a deal." C.App. at 421. The court explained that in this situation:
 
 
 53
 He's only said three words and he doesn't buy the onions ... and he doesn't pay the $3,000.00 and he doesn't know the head of the ring or the median guy in the ring and the deal falls through because he can't come up with the $3,000.00 or the ring members can't come up with the onion.... He's still a conspirator because, No. 1, we're assuming that there's a ring selling the cocaine or heroin in Philadelphia; No. 2, ... Mr. Smith learned of the existence of the ring; No. 3, Mr. Smith agreed to be a participant by just using three words, no action, no exchange of money, no exchange of onions but he's a conspirator because by his word out of his mouth, no action, he's agreed to further the object of the conspiracy, namely, to sell cocaine on the streets of Philadelphia and you may say he hasn't done anything I don't like the law. That's the dopiest law I've ever heard of. I feel sorry for Mr. Smith. He didn't do anything, and the law says: I'm sorry. Mr. Smith by using those words knew there was a ring and he voluntarily agreed to participate in furthering would [sic] one of its object so it is clear in English as I could command, that is my answer to your question.
 
 
 54
 C.App. at 421-22. A half hour after this example was given, the jury convicted all the defendants of conspiracy.
 
 
 55
 Defendants argue that this example is erroneous as a matter of law. We do not understand them to complain of the court's advice that a defendant could be a conspirator notwithstanding the failure to consummate the transaction. See United States v. Padilla, 982 F.2d 110, 113 (3d Cir.1992) ("[T]he crime of conspiracy does not require an actual drug sale. Rather, it requires an agreement."). Instead, they complain that the example could have led the jury to believe that involvement in a single drug sale with a member of a drug conspiracy is in itself sufficient to constitute the buyer as a member of that conspiracy.
 
 
 56
 As the First Circuit has recently noted, "[t]here is substantial law ... that a single drug sale does not automatically make buyer and seller co-conspirators." United States v. Moran, 984 F.2d 1299, 1302 (1st Cir.1993) (citing United States v. DeLutis, 722 F.2d 902, 906 (1st Cir.1983) (collecting cases)). We reached a similar conclusion in United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir.1986), cert. denied, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986), where we held, in the context of a conspiracy to transport stolen vehicles, that "the relationship of a buyer and seller, standing alone, without any prior or contemporaneous understanding beyond the mere sales agreement, does not establish conspiracy to transport stolen goods even though the parties know of the stolen nature of the goods. Under these circumstances, there is no joint objective to commit the underlying offense charged here, for the buyer's purpose is to buy and the seller's is to sell." See also United States v. McGlory, 968 F.2d 309, 324 (3d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 415, 121 L.Ed.2d 339 (1993).
 
 
 57
 The government defends the court's onion example, arguing that the street term "onion" and the cost of the drug indicated to the jury that the buyer was purchasing drugs for distribution, rather than personal use. However, the court did not explicitly define an "onion" in terms of an amount of drugs, nor did it state in its example that the amount purchased would ordinarily be more than for personal use, although that inference was likely from the dollar amount of the transaction. Evidence that a buyer intends to redistribute the drugs could lead a jury reasonably to infer that the buyer was a participant in one of the principal aspects of the conspiracy, the distribution of drugs, but the prevalent case law does not hold that every one-time purchaser of drugs from a member of a large conspiracy, even if for redistribution, necessarily becomes a member of that conspiracy. In Padilla, where we rejected the defendant's argument that any drug sales which did occur were for personal use and thus could not indicate intent to enter into a conspiracy, we noted that the taped conversations of defendant about drug sales "reflect[ed] an ongoing, shared understanding between men who had a relationship based on drugs." 982 F.2d at 113. Thus the drug purchases, while undoubtedly crucial evidence, were viewed in connection with other factors as supporting the defendant's conviction for conspiracy.
 
 
 58
 Most courts have addressed the effect of the single drug buy in the context of a defendant claiming a purchase for personal use, but those courts that have addressed the purchase-for-redistribution issue have determined that such a purchase is not sufficient, in and of itself, to prove membership in the larger conspiracy. In holding that a defendant who purchased and then distributed 70 ounces of cocaine could not be considered a member of a drug conspiracy based on that single transaction, the Second Circuit stated, "The purchase of the cocaine from [the seller] was not enough to prove a conspiracy in which [the seller] and the appellant participated. They had no agreement to advance any joint interest. The appellant bought at a stated price and was under no obligation to [the seller] except to pay him that price. The purchase alone was insufficient to prove the appellant a conspirator with [the seller] and those who were his co-conspirators." United States v. Koch, 113 F.2d 982, 983 (2d Cir.1940).
 
 
 59
 More recent cases apply similar analysis. For example, in United States v. Carbone, 798 F.2d 21, 27 (1st Cir.1986), the court found that a purchase of drugs for redistribution combined with the fact that the seller would not receive payment until the defendant had sold the drugs was sufficient evidence of a conspiracy. It stated that "[i]f the sale had not been made on credit, a credible argument might be made that it was a single transaction." Id. Similarly, in United States v. Creamer, 555 F.2d 612, 616 (7th Cir.), cert. denied, 434 U.S. 833, 98 S.Ct. 118, 54 L.Ed.2d 93 (1977), the court suggested that if a defendant could show that his sale of drugs was his sole connection with the buyer, the defendant would be entitled to a jury instruction that if the jury found the buyer to be an independent contractor, there could be no conspiracy.
 
 
 60
 United States v. Gunning, 984 F.2d 1476 (7th Cir.1993), on which the government relies for the proposition that a buyer and seller become co-conspirators when the purchase of drugs is for distribution, presented substantially different facts. In that case, the defendant, who wanted two and a half ounces of cocaine to sell to his customers, arranged to pool his money with others in order to buy the half kilogram that was available for purchase only in that quantity. In fact, Gunning is a good illustration of the premise underlying criminal conspiracy law, since the defendant there effected a transaction that would not have been possible but for the combination of forces. See Kapp, 781 F.2d at 1010; Moran, 984 F.2d at 1302-03. The court concluded that the evidence was sufficient to sustain Gunning's conviction since his role "greatly exceeded that of a buyer" because "he intended to distribute what he was going to buy [and] he brokered the larger sale to provide his seller with inventory." Id. at 1481. Gunning thus provides little help here.
 
 
 61
 We have recognized that drug conspiracies do not operate with the paper trail that generally accompanies legitimate business agreements. Much of the understandings in drug distribution are implicit, and the distinction between an independent contractor and a peripheral member of the conspiracy is often shadowy. In Theodoropoulos, we held that even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation. See 866 F.2d at 594. As we said there, "drug conspiracies involving numerous suppliers and distributors operating under the aegis of a common core group can be treated as a single conspiracy. The government need not prove that each defendant knew all the details, goals, or other participants." Id. at 593 (citations omitted). On the other hand, unless the "peripheral members ... have been aware of one another and have done something in furtherance of a single illegal enterprise, .. the conspiracy alleged lacks 'the rim of the wheel to enclose the spokes.' " United States v. Castro, 776 F.2d 1118, 1124 n. 4 (3d Cir.1985), cert. denied, 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986) (quoting Kotteakos, 328 U.S. at 755, 66 S.Ct. at 1243).
 
 
 62
 It follows from these cases that a jury must be told that it should evaluate the totality of the defendant's activities, which may include a single sale, to determine whether there was the requisite agreement. See United States v. Keck, 773 F.2d 759, 767-68 (7th Cir.1985) (single purchase of drugs for personal use may be combined with other evidence to establish a conspiracy). "Almost everything in such a case depends upon the context and the details. The evaluation of the facts is entrusted largely to the jury." Moran, 984 F.2d at 1303. Although the district court had earlier correctly set forth the elements of a conspiracy, the particular onion example was misleading insofar as it suggested that the words evidencing a one time attempted purchase, absent any evidence of prior or contemporaneous joint understanding as to a broader scheme, were sufficient as a matter of law to constitute the putative buyer a member of the conspiracy.
 
 
 63
 That not every faulty jury instruction requires a reversal of the conviction needs no string citation. If the error was harmless then the conviction may stand. A nonconstitutional error, as here, is harmless only if "it is highly probable that the error did not affect the judgment." United States v. Simon, 995 F.2d 1236, 1244 (3d Cir.1993) (quotations omitted). "To constitute a 'high probability,' we must have a sure conviction that the error did not prejudice the defendant. On the other hand, we may be firmly convinced that the error was harmless without disproving every reasonable possibility of prejudice." Id. (quotations and citations omitted). As the Second Circuit has recognized in United States v. Colombo, 909 F.2d 711, 714 (2d Cir.1990), "[t]he strength of the government's case against the defendant is probably the most critical factor in determining whether an error affected the verdict."
 
 
 64
 We have therefore examined the effect of the erroneous instruction with respect to the conspiracy conviction of each of the defendants. After closely scrutinizing the record, we are "firmly convinced" that there was overwhelming evidence of the participation in the conspiracy by defendants Price, Reginald Reaves, Cobb, Jackson, Darrell Reaves, and Long.
 
 
 65
 Darrell Reaves and Williams contend vigorously that the evidence against them was tenuous, and that therefore they were prejudiced by the erroneous jury instruction. We are not persuaded that is the case with Darrell Reaves. Four witnesses testified that Darrell Reaves was a member of the JBM, and at least one saw him wear a JBM ring. Tr.Trans. 6/19/92 at 53; 6/24/92 at 135-36, 149; 7/1/92 at 62-63; 7/2/92 at 107; 7/2/92 (p.m.) at 6-9. Further, these witnesses, as well as Darrell Reaves's own tape-recorded conversation, tied him to specific meetings, Tr.Trans. 6/19/92 at 54, 58, 60-61, 75, 100-04, drug deals, Tr.Trans. 6/19/92 at 54-55; 7/1/92 at 62-63, and violent acts, Tr.Trans. 6/19/92 at 56, 100-04; 7/1/92 at 87-88. Although he highlights two purported inconsistencies in the testimony, neither is sufficiently serious to lead us to conclude that the judge's erroneous example as to what would suffice to prove conspiracy could have affected the jury's verdict as to him.
 
 
 66
 Darrell Reaves argues that there is no confirmation that he ever engaged in the planned drug transaction discussed in his tape recorded conversation with Mead, and that therefore he was convicted for mere words regarding a future drug activity. This ignores that other portions of the same conversation reflect a past drug deal where he disbursed the proceeds to JBM members and a purchase he made that day and shared with his brother and his "young boys." Tr.Trans. 6/25/92 at 158-160; Gov't.Ex. 51 at 6-7. These statements alone would be sufficient for a jury to infer that Darrell Reaves entered into drug transactions on behalf of JBM members. In this case, we have a sure conviction that the erroneous jury instruction did not prejudice this defendant.
 
 
 67
 In contrast, we cannot characterize the evidence as to Williams's participation as overwhelming. There is no question that Williams was associated with members of the JBM, a circumstance Williams attributed to living in the neighborhood and playing on the basketball team sponsored by the mother of JBM member Kevin Bowman. Tr.Trans. 7/6/92 at 128-29. Even so, many of the former JBM members who testified for the government stated that they did not know Williams at all. See C.App. at 229 (Earl Stewart), 236 (David Baynham), 239 (Dwight Sutton). Williams did not attend Jones's wedding, which was a major event for JBM members. Tr.Trans. 6/29/92 at 18; 7/6/92 at 138.
 
 
 68
 The government's theory at trial was that Williams was a member of Kevin Bowman's squad, and that he was tied in directly with Aaron Jones. Only two witnesses mentioned Williams at trial: William Mead and Chris Anderson. In addition, there were tape recorded conversations between Mead and Williams in which Williams associated himself with Jones and boasted of his large drug sales, and there were various conversations among Mead, Jones and Fields in which they discussed "Mikie."
 
 
 69
 Mead testified that he purchased three ounces of cocaine from Williams on August 1, 1990. Tr.Trans. 6/26/92 at 13-15, 25-26. Since the government does not suggest that Mead was a JBM member, that sale does not alone evidence Williams's participation in the JBM. In any event, Williams was acquitted on the substantive charge of cocaine distribution based on this alleged sale.
 
 
 70
 Mead interpreted for the jury one of his recorded conversations with Jones and Fields in which Jones, apparently unwilling to deal with a prospective buyer who was Williams's regular customer, stated that he would not let the customer go over Williams's head, Tr.Trans. 6/25/92 at 164, and a later conversation in which Fields said he was going to demand money from that prospective buyer for trying to go around Williams, Tr.Trans. 6/26/92 at 5-7.
 
 
 71
 However, during his extensive cross-examination, Mead conceded that at times in his conversation with Jones and Fields, Fields was talking about different Michaels being involved in drugs, Tr.Trans. 6/29/92 at 78-79, 83, lending some support to Williams's position that Jones and Fields were referring to another Mike, and that it was only Mead who introduced Williams into the conversation. Tr.Trans. 6/29/92 at 27-30, 56-57, 101. Fields referred to a prospective visit to a "Mike" but Mead admitted on cross-examination that Fields was looking for marijuana, rather than cocaine, on the day Mead testified Fields went to visit Williams. Tr.Trans. 6/29/92 at 73-74, 93.
 
 
 72
 The most inculpatory evidence against Williams consists of the recordings of two conversations between Williams and Mead, in which Williams claimed to be close to Jones and to have engaged in large drug deals. C.App. at 558-74. Mead testified that he understood these conversations to demonstrate that Williams was a member of the JBM and that he dealt in cocaine. Tr.Trans. 6/26/92 at 8-11, 15-19. During three days of cross examination, Williams attempted to show that Mead used extortion to get money for himself. Mead admitted that he assisted Fields in extorting a drug dealer, Tr.Trans. 6/29/92 at 38-40, 115-18, but denied extorting Williams. Tr.Trans. 6/29/92 at 140. He testified he arrived at Williams's house on one occasion to collect money for another member of the JBM, but admitted that Williams denied any knowledge of any monies owed and suggested Mead had the wrong Mike. Tr.Trans. 6/29/92 at 143.
 
 
 73
 Although, of course, a jury may return inconsistent verdicts, the jury's acquittal of Williams on the substantive count of selling cocaine to Mead, despite Mead's explicit testimony to the contrary, suggests that the jury found the government's case through Mead's testimony was not totally persuasive.
 
 
 74
 Anderson was the only witness other than Mead to mention Williams. Anderson testified that he received two ounces of cocaine from Williams in 1990 and five ounces in 1991, Tr.Trans. 7/2/92 at 126, and that he delivered one kilogram of cocaine supplied by James Cole through Dave Baynham to Williams in 1990. Tr.Trans. 7/2/92 (p.m.) at 13. Anderson conceded that Williams did not admit to membership in JBM, but he concluded that Williams was a member because he called other members "family" and hugged them, Tr.Trans. 7/2/92 at 126; 7/6/92 at 54, and Sam Brown introduced Williams as one of Bowman's people, Tr.Trans. 7/6/92 at 58, and Bowman had been shown to be a squad leader.
 
 
 75
 Williams sought to impeach Anderson's testimony on cross-examination by showing that his testimony in this trial was contradictory to his previous statements. Anderson had testified at the grand jury that he had delivered a half a kilogram (not a full kilogram) to Williams and that it was shared with another person. Tr.Trans. 7/6/92 at 33-34. He had never before mentioned to officials the transactions totalling seven ounces of cocaine he testified at trial that he received from Williams. Tr.Trans. 7/6/92 at 38-39. And Williams's attorney cross-examined Anderson heavily on his identification of Williams as the Michael he had dealt with in the past, since apparently there was a "light-skinned Mike" and a "Mikal" or "Malik" who were also involved in drug transactions with Anderson. Tr.Trans. 7/2/92 at 127, 129; 7/6/92 at 49-51. There was a question raised by Williams about the integrity of a government-arranged photo array in which Williams's picture was the only color photo and he was the only person to appear twice in the array. Tr.Trans. 7/2/92 at 150, 141.
 
 
 76
 Williams was the only defendant to testify. He denied being a member of the JBM. Tr.Trans. 7/6/92 at 129. He admitted he did deal marijuana and that he sold some to Fields. Tr.Trans. 7/6/92 at 135. He admitted rendering free remodeling services to Fields and giving him marijuana, but he claimed this was because he was frightened of being killed if he protested. Tr.Trans. 7/6/92 at 130-31, 134. Similarly, he insisted the statements on the tape recordings were his attempt to impress Mead so that Mead would stop extorting him. Tr.Trans. 7/6/92 at 135-42. He denied knowing Anderson at all. Tr.Trans. 7/6/92 at 138. On cross-examination, he at first denied knowing various defendants' nicknames prior to the indictment, Tr.Trans. 7/6/92 at 146-48, but later agreed that he did know and use the names, Tr.Trans. 7/6/92 at 151-53, 168, 179-80. He continued to insist that his statements on the tape were puffing made in response to his fear of Mead's demands for money. Tr.Trans. 7/6/92 at 154-59, 162, 167, 171, 174, 177, 180-81, 187. He specifically denied selling cocaine to Mead. Tr.Trans. 7/6/92 at 189.[11]
 
 
 77
 Although there would be sufficient evidence to sustain Williams's conviction in the absence of the erroneous jury instruction regarding the sale of an "onion," we cannot say that the instruction did not contribute to the conviction of Williams for conspiracy. Unlike the cases presented as to the other defendants, the case against Williams was close, see Colombo, 909 F.2d at 714, and the evidence, albeit sufficient, was not overwhelming. It follows that the error was not harmless as to him and we must vacate the conviction of Williams and remand for a new trial.
 
 H.
 Sufficiency of the Evidence
 
 78
 Long and Cobb contend that the evidence at trial was insufficient to sustain their conspiracy convictions. A "claim of insufficiency of the evidence places a heavy burden on an appellant," United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir.1990), cert. denied, 498 U.S. 1107, 111 S.Ct. 1015, 112 L.Ed.2d 1097 (1991) (quotation omitted), because we must view the evidence in the light most favorable to the government. "The evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt." United States v. Sandini, 888 F.2d 300, 311 (3d Cir.1989), cert. denied, 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990) (quoting United States v. Cooper, 567 F.2d 252, 254 (3d Cir.1977)). Instead, this Court reviews the evidence to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
 
 
 79
 Long claims that the evidence does not support his conviction of conspiracy because at the most it showed him to be an independent drug dealer who associated with members of the JBM. However, Carson testified that Long was a member of the JBM and that he saw him at JBM meetings. Carson also testified that Long worked for Casey, a claim substantiated by the arrest of Long and Casey together in October of 1987. This was also confirmed by a tape recording between Jones and Mead, in which Jones refers to "T.L." as one of "Goldie [Casey]'s people." Gov't Ex. 58 at 2. Additionally, Long was present at Casey's funeral, as well as Jones's wedding, two significant social occasions at which many, although not necessarily all, JBM members gathered. Based on this evidence, a rational jury could certainly find beyond a reasonable doubt that Long had joined in the drug conspiracy. We find no cause to overturn his conviction.
 
 
 80
 Cobb also argues that the evidence showed he was an independent contractor or was involved in multiple conspiracies. The evidence, however, reflects that Cobb was an enforcer for Leroy Davis and Sam Brown, JBM squad leaders, and participated in numerous acts of violence to strengthen the JBM's control over the drug market. Further, Cobb sold cocaine for Davis on a few occasions and was involved in attempts to re-establish one of the JBM's prior cocaine connections. These facts are sufficient to permit a rational jury to find beyond a reasonable doubt that Cobb joined in the drug conspiracy. We find no cause to overturn his conviction.
 
 III.
 SENTENCING
 
 81
 All the defendants except Reginald Reaves challenge the application of the Sentencing Guidelines as to them. "When reviewing the sentencing decisions of the district courts, we exercise plenary review over legal questions about the meaning of the sentencing guidelines, but apply the deferential clearly erroneous standard to factual determinations underlying their application." United States v. Collado, 975 F.2d 985, 990 (3d Cir.1992) (quotations omitted).
 
 
 82
 In essence, defendants challenge the attribution to them of involvement in more than 500 kilograms of cocaine, the threshold needed for the court to arrive at a base offense level of 40. They do not question that the JBM distributed that amount, but claim they are not accountable for drugs purchased and distributed by other members of the conspiracy. The Guidelines do not permit sentencing a defendant for the entire amount of drugs in a conspiracy merely because the defendant has been found guilty of the crime of conspiracy. The sentencing court can consider only "relevant conduct," including the "conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant." U.S.S.G. Sec. 1B1.3 comment. (n. 2).
 
 
 83
 As we stated in United States v. Miele, 989 F.2d 659, 666 (3d Cir.1993), "the standard for accomplice attribution under Sec. 1B1.3 is stringent." In Collado, we held that a defendant can be responsible for the quantity of drugs distributed by his or her co-conspirators only if the drugs distributed (1) were in furtherance of the jointly-undertaken activity, (2) were within the scope of the defendant's agreement, and (3) were reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake. See 975 F.2d at 995.
 
 
 84
 With these standards in mind, we review the individual circumstances of each defendant.
 
 A.
 James Price
 
 85
 The court found that Price was responsible for at least 500 kilograms of cocaine, leading to a Base Offense Level of 40. See U.S.S.G. Sec. 2D1.1(c)(2). Relying heavily on this court's decision in Collado, Price argues that he was inappropriately credited for cocaine dispensed by the conspiracy after December 12, 1988 when he was incarcerated. While we reject a per se rule that arrest automatically bars attribution to a defendant of drugs distributed after that date, we agree that since "[t]he relevant conduct provision limits accomplice attribution to conduct committed in furtherance of the activity the defendant agreed to undertake," Collado, 975 F.2d at 997, a defendant cannot be held responsible for conduct committed after he or she could no longer assist or monitor his or her co-conspirators. However, in this case the court did not rely on any drug transactions taking place after December 12, 1988, but instead counted 488 kilograms of cocaine that reached the JBM from its Florida source. The district court relied on the personal observations of three witnesses who were involved in transporting the drugs, whom the court found to be credible, and we have no cause to overturn this determination.
 
 
 86
 In attributing more than 500 kilograms to Price, the court found that Dwight Sutton, who testified to delivering five kilograms to the JBM, meant to say fifty kilograms. In the alternative, the court found Price was responsible both for the 12 kilograms to which Michael Cochrane testified and the various quantities referred to in Carson's testimony. Although we recognize that the court was not as definite in this regard as it was with the other defendants, having reviewed the testimony cited by the court we conclude that it was not clearly erroneous for it to have credited Price with at least 12 kilograms of cocaine in addition to the 488.
 
 
 87
 Price also argues that the court erred in adding two levels for a possession of a firearm. See U.S.S.G. Sec. 2D1.1(b)(1). We reject Price's argument that there was insufficient evidence to make such a finding in light of the admission of the gun into evidence, as discussed supra. Price argues that even if he had a gun, the enhancement should not apply because there is no evidence that the gun was possessed to further the conspiracy. A note to Sec. 2D1.1(b)(1) states that
 
 
 88
 [t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.
 
 
 89
 U.S.S.G. Sec. 2D1.1 comment. (n. 3). Although there was no evidence at trial linking Price to specific acts of violence, there was ample evidence that the JBM was an organization that ruled through violent intimidation and whose individual members were targets of violence. Under these circumstances, we find that the government met its burden that it was not "clearly improbable" that Price's gun was possessed in furtherance of the aims of that conspiracy.
 
 B.
 Leroy Jackson
 
 90
 The district court imputed to Jackson, Darrell Reaves, Cobb, and Long at a minimum the 530 kilograms obtained by the JBM from Earl Stewart in 1988 and 1989. See Tr.Trans. 6/23/92 at 176-77 (50 kilograms in early 1988); id. at 183 (100 kilograms in late 1988); id. at 184-87 (150 kilograms in the end of 1988); id. at 197-200 (230 kilograms in August 1989). The court also added some additional quantities to some defendants. None of the defendants challenge that Stewart delivered at least 530 kilograms to various members of the conspiracy, but they each challenge attribution of this amount to themselves.
 
 
 91
 We reject Jackson's challenge to the attribution of 530 kilograms of cocaine on the ground that he was not a member of the conspiracy. Nor do we accept his argument that the sentencing court simply attributed all the conspiracy's drug transactions to him. On the contrary, the court followed our decision in Collado, and made an individualized inquiry for each defendant.
 
 
 92
 As to Jackson, the court found he "was in a unique position to have personal knowledge about the scope of the JBM organization," C.App. at 634, and should have reasonably foreseen the quantity of drugs being distributed by the organization. He assisted those transactions by supplying and distributing drugs, relaying information on distribution plans, and advising the leaders of the JBM how to structure the organization and facilitating deals. These findings are not clearly erroneous and demonstrate that all the 530 kilograms were within the scope of Jackson's agreement. See Collado, 975 F.2d at 997-98.[12]
 
 
 93
 Jackson also argues that the court erred in adding two levels for possession of a firearm, and challenges the government's reliance on a statement he made to a probation officer since he contends he was not informed of his Fifth Amendment right not to incriminate himself. We have held that Jackson had such a right in this situation. See United States v. Frierson, 945 F.2d 650, 656 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992). And, contrary to the government's claim, we have not yet determined whether Miranda-like warnings are required in such circumstances. See id. at 660 n. 5 ("We leave th[at] issue[ ] for another day."). We need not do so in this case, however, because it would not affect Jackson's sentence. Even without the enhancement for weapons possession, Jackson would still have a 40 Base Offense Level with a Criminal History Category of IV, requiring a minimum of 360 months, his present sentence. Therefore, we uphold the court's sentence for Jackson.
 
 C.
 Anthony Long
 
 94
 We reject as well Long's argument that the district court erred in calculating his offense level at 42. There was ample testimony that Long was a member of Casey's squad and he was found by the district court to have been "a key person in Mr. Casey's organization." C.App. at 452. Before Casey's arrest, at least 150 kilograms came in from Stewart, which would be fully attributable to Long and would place him at 38. This, plus the two levels for possession of a firearm, would place Long, who had a Criminal History Category of III, at level 40, even if the rest of Stewart's shipment could not reasonably be attributable to Long. Hence, his sentence must be affirmed.
 
 D.
 Joseph Cobb
 
 95
 Cobb argues that the district court erred in attributing to him both the 530 kilograms supplied to the JBM by Stewart and the 470 kilograms supplied to the JBM later by the Florida source. Although there was conflicting testimony on the record, the district court concluded that Cobb was not only aware of the drug shipments from Stewart to Jones, but "had a special rapport with Stewart and acted as an intermediary for him." S.App. at 71. The court also found that Cobb not only knew about the alternative Florida source, but "acted as a bodyguard in that connection." S.App. at 72. Cobb also assisted in the distribution of this cocaine by using violence (including two shootings) to ensure that drug dealers in what the JBM viewed as its territory worked through the JBM. In light of this evidence, the court was justified in determining that these drug transactions were "in furtherance of the ... jointly-undertaken ... activity, were within the scope of the defendant's agreement, and were reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake." Collado, 975 F.2d at 995 (quotations omitted).[13]
 
 E.
 Darrell Reaves
 
 96
 At the sentencing hearing, the court found that Darrell Reaves was a member of the conspiracy, had participated in specific drug transactions, and had worked for his brother Reginald (a squad leader) as a drug distributor. None of these findings are clearly erroneous. The court also relied on evidence showing that Darrell Reaves received drugs directly from Jones, and that Darrell Reaves attended meetings where the major participants in the conspiracy, including Jones and Cole, discussed the future of their California drug connection. There was also evidence which linked Darrell Reaves to two shootings sponsored by the JBM to further their goal of eliminating the competition. Given these additional factors, the court could reasonably find that Darrell Reaves was more than simply a distributor for a squad, and that the scope of his agreement extended to the activities of the entire conspiracy, warranting attribution of at least 530 kilograms of cocaine to him.
 
 
 97
 Darrell Reaves also challenges the district court's two level enhancement for possession of a weapon. He first argues, relying on the conflicting testimony at trial, that the court's finding that he ever possessed a gun was clearly erroneous. The conflict in testimony was raised before the district court, who chose to believe those witnesses who stated Darrell Reaves had had a gun. We cannot say that the finding that the government demonstrated gun possession by a preponderance of the evidence was clearly erroneous.
 
 
 98
 Darrell Reaves also seems to argue that there was no evidence he used a gun in furtherance of the conspiracy. However, the Sentencing Commission determined that it was the risk of violence caused by the combination of firearms and drugs that merited an increase in sentence. "The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. Sec. 2D1.1 comment. (n. 3) (emphasis added). There does not have to be evidence that the defendant ever used the gun to commit acts of violence. In any event, the district court found that Darrell Reaves had "participated in the shoot out at City Hall." C.App. at 618. Even if there was no evidence that Darrell Reaves used his gun at that particular encounter, a reasonable inference can be drawn that Darrell Reaves possessed a gun in order to further the violent aims of the conspiracy.
 
 
 99
 Darrell Reaves argues that the court erred in declining to decrease his offense level under Sec. 3E1.1 because of his post-offense drug rehabilitation and his general acceptance of responsibility. Although Darrell Reaves did express remorse at his sentencing hearing for "things in my life" and admitted that he had "done wrong," C.App. at 487-88, he also seemed to challenge the jury's verdict. See C.App. at 487-88 ("It was nothing like Carson said or Jamison said, you know what I mean. I have done an act with William Mead which we were about to do and it wasn't the way--I did it but I'm not here to defend it."). On cross-examination, he refused to state plainly that he was a member of the JBM and denied most of the testimony elicited at trial about him. The only unlawful conduct Darrell Reaves admitted to was cheating a drug dealer and selling small amounts of drugs, and he denied that those activities were linked to the JBM. Even the two ministers who spoke on Darrell Reaves's behalf conceded that he did not accept responsibility for any specific acts.
 
 
 100
 The sentencing court found that Darrell Reaves had "not admitted being involved in the activities of the JBM." C.App. at 613. "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. Sec. 3E1.1 comment. (n. 5). In this case, the court made factual findings which contradict the sentencing testimony of Darrell Reaves. For example, Darrell Reaves denied carrying a gun, see C.App. at 491, but the court found to the contrary, see C.App. at 612. "A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. Sec. 3E1.1 comment. (n. 1(a)).
 
 
 101
 Darrell Reaves also claims that the district court erred in not granting him a reduction for being a minimal or minor participant in the conspiracy under Sec. 3B1.2. Whether a defendant is entitled to that decrease depends on whether the defendant's "involvement, knowledge and culpability" were materially less than other participants. United States v. Headley, 923 F.2d 1079, 1084 (3d Cir.1991). In Headley, we quoted approvingly the Second Circuit's view that such a determination "must depend necessarily on such factors as the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." Id. (quoting United States v. Garcia, 920 F.2d 153, 155 (2d Cir.1990)).
 
 
 102
 The district court found that Darrell Reaves was neither a minimal nor minor participant. This is a question of fact, subject to review for clear error. See United States v. Gonzales, 927 F.2d 139, 145 (3d Cir.1991). The defendant bears the burden of proof on this point. See United States v. McDonell, 888 F.2d 285, 291 (3d Cir.1989). The evidence on the record demonstrates that Darrell Reaves was aware of the scope of the conspiracy and was involved in distribution of drugs and acts of violence. The district court found that Darrell Reaves was "involved in distributing drugs in his brother's squad, and was his brother's 'right-hand man.' Defendant attended JBM meetings; and ... was involved in at least two violent acts of the organization. Over 564.5 kilograms of cocaine can be attributed to the Defendant." C.App. at 619. These findings are not clearly erroneous. Darrell Reaves also seems to argue that every conspiracy must have some minor participants, and that since he was not mentioned often at trial, he is one of those people. We disagree. There were 26 defendants indicted; 14 of them have entered plea bargains with the government. Just because none of Darrell Reaves's six co-defendants have been denominated minor participants does not mean that his role should be found to have been a minor one.
 
 
 103
 Darrell Reaves finally argues that he merits downward departures both because of the combination of his drug rehabilitation and extraordinary personal transformation as well as because his criminal history score significantly overrepresented the seriousness of his criminal history. The district court found that it had the authority to depart on both grounds, but that "circumstances warranting a downward departure [do not] exist in this case." C.App. at 621, 622. Since the district court denied Darrell Reaves's requests on their merits, this court lacks jurisdiction to review those decisions. See United States v. Miele, 989 F.2d 659, 668 n. 11 (3d Cir.1993).
 
 IV.
 CONCLUSION
 
 104
 For the foregoing reasons, we will affirm the judgments of conviction and sentence of James Price, Reginald Reaves, Joseph Cobb, Leroy Jackson, Darrell Reaves and Anthony Long, and we will reverse the judgment of conviction and sentence of Michael Williams and remand to the district court for a new trial.
 
 SUR PETITION FOR REHEARING
 
 105
 (No. 93-1069)
 
 February 4, 1994
 
 106
 Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges.
 
 
 107
 The petition for rehearing filed by Appellant Leroy Jackson in the above-entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judge Becker would grant rehearing.
 
 SUR PETITION FOR PANEL
 REHEARING
 
 108
 (No. 93-1160)
 
 February 16, 1994
 
 109
 Present: SLOVITER, Chief Judge, GREENBERG and ROTH, Circuit Judges.
 
 
 110
 The petition for rehearing filed by Appellee United States of America in the above-entitled case having been submitted to the judges who participated in the decision of this court, and no judge who concurred in the decision having asked for rehearing, the petition for rehearing is denied.
 
 SUR PETITION FOR PANEL
 REHEARING
 
 111
 (No. 93-1094)
 
 March 11, 1994
 
 112
 Present: SLOVITER, Chief Judge, GREENBERG, and ROTH, Circuit Judges.
 
 
 113
 The petition for rehearing filed by Appellant Darrell Reaves in the above-entitled case having been submitted to the judges who participated in the decision of this court, and no judge who concurred in the decision having asked for rehearing, the petition for rehearing is denied.
 
 
 
 [1]
 Each appellant adopts all his co-appellants' applicable arguments as provided by Fed.R.App.Pro. 28(i). In light of our disposition of the claims on the merits, we need not review the government's claim that this practice is insufficient to preserve a claim of error with respect to certain "fact-specific" contentions
 
 
 [2]
 After Cobb's initial motion to sever from all his co-defendants was denied, the court granted him 10 days to renew his motion with greater particularity as to the alleged prejudice. Cobb did not renew his motion
 
 
 [3]
 The government first argues that since Price did not file the in limine motion before trial, he waived his claim. See Fed.R.Crim.Proc. 12(b)(3) (motion to suppress must be raised prior to trial); id. at 12(f) (failure to raise during appropriate time period is a waiver). However, Rule 12(f) provides that "the court for cause may grant relief from the waiver." Inasmuch as the government had also argued in the district court that Price had waived the suppression issue, we construe the district court's ruling on the merits of the motion as a grant of relief from the waiver
 
 
 [4]
 This statement was followed by:
 Q. When was the last time you had a meal in a prison kitchen dorm, chow hall?
 A. I don't eat breakfast, I eat lunch and dinner.
 C.App. at 352.
 
 
 [5]
 No other defendant filed a motion for a new trial on Brady grounds. It follows that despite Fed.R.App.Pro. 28(i), we may not consider the Brady issue as to any of them. See Thornton, 1 F.3d at 157 n. 8
 
 
 [6]
 Although Reginald Reaves contends the court was one-sided, we note that after the direct-examination and cross-examination of a prosecution witness, the judge chastised both parties for their lengthy examinations
 Before we begin, may I make one observation, in the best way I can to both sides. I listened very carefully to Mr. Carson's testimony, and I consciously believe that his direct testimony could have been put on in half a day, and all of the cross-examination that was useful could have been done in half a day.
 C.App. at 221-222 (emphasis added).
 
 
 [7]
 We note that defendant Williams was acquitted on the substantive count of cocaine distribution despite Williams's counsel's being chided by the court on numerous occasions regarding his painstaking cross-examination technique. See, e.g., C.App. at 133, 272-73, 286, 287-89, 351
 
 
 [8]
 After explaining that distribution of cocaine and heroin was a violation of federal law, the court continued:
 It's a violation of Federal law because under the jargon in the Federal law, they're considered controlled substances so you have to take whether you think it should be legalized or not legalized is really beside the point.
 C.App. at 365-66 (emphasized words omitted from Brief of Appellant Cobb at 12).
 
 
 [9]
 The sentence complained of appears in the following paragraph:
 You have a decision to make. Either there's evidence which satisfies you with regard to each defendant, there's not evidence to satisfy you with regard to each defendant or a particular defendant. That's your job. That's your task to evaluate the facts. Nothing that I've said is any comment on the facts because that's not my job. We wouldn't have a jury if I were the one who made the decision about the facts but basically, that's your task, that's your job, that's your decision and you have to decide whether each one of these defendants deliberately participated in a drug ring selling cocaine or heroin on the streets of Philadelphia at the time that is alleged in the indictment and joined in the conspiracy with knowledge that that's what was going on.
 C.App. at 415.
 
 
 [10]
 An "onion" used in this context signified a particular quantity of drugs
 
 
 [11]
 The only other evidence linking Williams to the JBM was a slip of paper with Williams's phone number which was found at a JBM meeting place. Tr.Trans. 6/25/92 at 109-10; 6/26/92 at 19-20
 
 
 [12]
 Jackson also argues that the Brady violation discussed above so discredits Jamison's testimony regarding his drug sale that the 166 grams of cocaine base (which would have on their own supported a base offense level of 34) should not have been included. Although we have held supra that the Brady violation did not alter the outcome of the trial, we also note that the court did not rely on the 166 grams in setting the base offense level
 
 
 [13]
 Because we find sufficient grounds to uphold the sentence based on the quantity of drugs, we do not reach the district court's alternative determination that Cobb's violent activities merited an upward departure