**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3572
_____

UNITED STATES OF AMERICA

v.

ADAM SCOTT,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. No. 2-10-cv-00677-001)
District Judge:  Honorable Petrese B. Tucker

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 12, 2015

Before:  McKEE, *Chief Judge*, HARDIMAN and SCIRICA, *Circuit Judges*.

(Filed: April 14, 2015)

_____

OPINION[*]
_____


McKEE, *Chief Judge*.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

# I.

## A. Factual Background

Since we write primarily for the parties, who are familiar with the background of this case, we discuss the events leading to this appeal only briefly. In April 2010, law enforcement officials in West Chester, Pennsylvania obtained authorization to conduct a wiretap on a cell phone used by Vincent Marchant. The investigation revealed that Marchant was actively selling powder and crack cocaine and that his stock was being supplied by Appellant Adam Scott.[1]

Marchant was arrested on June 2, 2010 and thereafter confirmed that Scott was supplying him with illegal drugs. On May 18, 2010, law enforcement officials obtained authorization to conduct a wiretap on two cell phones used by Scott. As the wiretap investigation continued, law enforcement officials began to conduct physical surveillance, including following Scott's car. However, Scott appeared to notice that he was being followed and took measures to evade the surveillance. He also destroyed five of his cell phones, and thus all communications from the two cell phones that law enforcement officials had been monitoring ceased.

Law enforcement officials were subsequently able to reestablish physical surveillance outside the home of Trinity Jennings, where Scott had previously been seen.

---

[1] Marchant began dealing with Scott in February 2009. Until May 2010, Scott was Marchant's only supplier. Even when Marchant started buying from other people, he characterized Scott as his "main supplier." Marchant bought from Scott on a weekly basis, with a regular order of 4.5 ounces of cocaine and 62 grams of crack, although sometimes he bought as much as 13 ounces of cocaine in a single transaction. Typically, Scott and Marchant met in person to make their transactions. However, on one occasion, Scott left the drugs for Marchant with Darryl Naylor, who then delivered them to Marchant.

Investigators also began to rely on Darryl Naylor.[2] His conversations with Scott had been intercepted on the Scott wiretaps, and Naylor thereafter agreed to cooperate with law enforcement. Naylor identified Scott's Everhart Road apartment, where investigators also set up physical surveillance. Scott was seen coming and going from this apartment building several times.

On September 15, 2010, investigators were alerted by another police department that Scott was operating a car registered to Monique Herndon. West Chester police officers eventually stopped Scott for a traffic code violation and obtained his consent to search the car. A drug detection dog was brought to the scene and alerted to the presence of narcotics, but none were found in the brief search. However, the officers did find what appeared to be an electronically controlled trigger for a hidden compartment under the dashboard and, therefore, seized the car. Police discovered a hidden compartment used to transport drugs while searching that car pursuant to a search warrant.

After being stopped, Scott reportedly called Naylor and expressed concern that the officers had found the hidden compartment in the car. Scott also told Naylor that he was going back to his apartment to clean up, as he was concerned that the officers knew where he lived. He also told Naylor that he would subsequently be going to the Spare Rib bar in West Chester. Naylor conveyed this information to law enforcement.

---

[2] Scott and Naylor became friends in 2005. In 2008, Naylor leased a storefront, an apartment, and a party hall for two joint business ventures with Scott. However, when the business ventures proved unsuccessful, the pair began to use the property for cooking, packaging, and selling drugs. In the drug scheme, Scott had the majority of customers. While Naylor had a few of his own, he primarily assisted Scott with his customers. Naylor helped cook and package the drugs and also drove and accompanied Scott and served as a lookout for some transactions. Scott and Naylor sold drugs from the storefront for more than a year.

Late that night, Scott was arrested at the Spare Rib bar, where officers recovered $985 in cash, cell phones, and a key to the Everhart Road apartment. A subsequent search of the Everhart Road apartment pursuant to a search warrant disclosed crack cocaine, marijuana, a loaded .32 caliber Keltec handgun, eleven cell phones, over $15,000 worth of jewelry, and $29,689 in rubber-banded stacks of cash. Police also recovered paraphernalia associated with drug distribution and sales as well as plastic bags containing crack and marijuana.

## B. District Court Proceedings

Thereafter, a federal grand jury returned an indictment[3] charging Scott on five of the eleven counts:

- Count One charged Scott with conspiracy to distribute five kilograms or more of cocaine and 280 grams or more of cocaine base ("crack"), in violation of 21 U.S.C. § 846;

- Count Seven charged Scott with distribution of 28 grams or more of cocaine base ("crack"), in violation of 21 U.S.C. § 841(a) and (b)(1)(B);

- Count Nine charged Scott with possession with intent to distribute cocaine base ("crack"), in violation of 21 U.S.C. § 841(a) and (b)(1)(C);

- Count Ten charged Scott with possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1); and

- Count Eleven charged Scott as a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

---

[3] Marchant was a co-defendant in the indictment. He pled guilty to conspiracy to distribute five kilograms or more of cocaine and 280 grams or more of cocaine base ("crack"), in violation of 21 U.S.C. § 846, and five counts of distribution of cocaine and crack cocaine, in violation of 21 U.S.C. § 841(a)(1).

A jury subsequently convicted Scott on each of the counts in which he was named, and Scott was ultimately sentenced to a total of 300 months incarceration followed by a period of supervised release. This appeal followed.[4]

## II.

We address each of Scott's claims of error in turn.

## A. Whether there exists a variance between the indictment and the proof.

### 1. Standard of Review

"We exercise plenary review over properly preserved claims of . . . variance." *United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010) (citing *United States v. Daraio*, 445 F.3d 253, 259 (3d Cir. 2006)). However, where such a claim is raised for the first time in a post-trial motion, we review for plain error. *Id.* (citing *United States v. Tiller*, 302 F.3d 98, 105 (3d Cir. 2002)).

> Plain error review requires a four-step inquiry, as follows:
>
> First, there must be an error or defect—some sort of deviation from a legal rule . . . . Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings. Fourth and finally, if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Olano*, 507 U.S. 725, 732–36 (1993)) (internal quotation marks, citations, and alterations omitted).

---

[4] We have jurisdiction over this matter pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

"[T]he plain-error exception to the contemporaneous-objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 15 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)) (internal quotation marks omitted).

### 2. Discussion

Scott contends that his conviction for conspiracy to distribute 500 grams or more of cocaine and 280 grams or more of crack should be reversed because of the existence of a prejudicial variance between the indictment and the proof. He claims that "Naylor's testimony failed to support a single conspiracy . . . . Instead, it tended to show the existence of two distinct conspiracies, thus resulting in a fatal variance from the Indictment." (Appellant Br. 26.)

A variance exists "where the charging terms [of the Indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Castro*, 776 F.2d 1118, 1121 (3d Cir. 1985) (citing *United States v. Somers*, 496 F.2d 723, 743 n.38 (3d Cir. 1974)). "To prevail . . . [the appellant] must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right." *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996) (citing *United States v. Adams*, 759 F.2d 1099, 1109 (3d Cir. 1985)).

"Where a single conspiracy is alleged in the indictment, there is a variance if the evidence at trial proves only the existence of multiple conspiracies." *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989) (citing *United States v. Smith*, 789 F.2d 196, 200

6

(3d Cir. 1986)).  "We will sustain the jury's verdict if there is substantial evidence, viewed in the light most favorable to the Government, to support a finding of a single conspiracy."  *United States v. Perez*, 280 F.3d 318, 345 (3d Cir. 2002) (citing *Smith*, 789 F.2d at 200).

"To prove a conspiracy, the government must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal."  *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) (citing *United States v. Robinson*, 167 F.3d 824, 829 (3d Cir. 1999)).  In determining whether there is a single conspiracy or multiple conspiracies, we consider three factors: "(1) whether there was a common goal among the conspirators; (2) whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators; and (3) the extent to which the participants overlap in the various dealings."  *United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007) (quoting *Kelly*, 892 F.2d at 259) (internal quotation marks omitted).

"The government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants."  *Gibbs*, 190 F.3d at 197 (citing *United States v. Theodoropoulos*, 866 F.2d 587, 593 (3d Cir. 1989), *overruled on other grounds by United States v. Price*, 13 F.3d 711, 727 (3d Cir. 1994)).

"[A] simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy."  *Id.* (citing *United States v. McGlory*, 968 F.2d 309, 324–25 (3d Cir. 1992)).  However, "even an occasional supplier (and by implication

7

an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." *Price*, 13 F.3d at 728 (citing *Theodoropoulos*, 866 F.2d at 594).

> [W]here [an alleged coconspirator]'s only involvement in the conspiracy appears to be drug purchases, courts have looked to the surrounding circumstances to determine whether the defendant is a mere buyer who had such limited dealings with the conspiracy that he cannot be held to be a conspirator, or whether he has knowledge of the conspiracy to the extent that his drug purchases are circumstantial evidence of his intent to join that conspiracy.

*Gibbs*, 190 F.3d at 199.

Scott contends that "the evidence showed two distinct conspiracies with the appellant, Scott, as the main supplier or hub of the conspiracy, and Marchant and Naylor as separate spokes in the conspiracy" with no "rim" connecting the separate spokes. (Appellant Br. 27–28.) However, the evidence supports the inference that there was, in fact, a single conspiracy.

The conspiracy between Scott and Naylor was more than just a relationship between a buyer and seller. Naylor was a principal and trusted associate of Scott. Scott and Naylor had been friends for years, had attempted to start legitimate business ventures together, and found their way into drug dealing together. Naylor helped Scott cook cocaine into crack and to package these drugs for sale. (App. 735–36.) Naylor also generally helped Scott with his drug customers. (App. 736–37.)

The extent of Marchant's participation in the conspiracy is more than enough evidence of his intent to join the conspiracy between Scott and Naylor. A substantial amount of drugs was moved by Marchant. He had a standing order with Scott, and he

had previously purchased drugs on credit. Scott and Naylor's drug scheme was also substantially dependent on Marchant. Marchant was Scott's "horse," meaning that he moved a majority of the drugs. (App. 758–59.) Likewise, Marchant got most of his drugs from Scott. (App. 529–30.)

Not only was Naylor aware of Marchant's identity as Scott's customer, but he had delivered the drugs to Marchant on Scott's behalf. (App. 759–60.) Significantly, Marchant called Naylor, not Scott, to set up that particular deal. (App. 760.)

When Marchant was arrested, Scott was "pretty shook" and told Naylor that he "lost [his] arm," which Naylor interpreted as "he lost a major part of what he was doing." (App. 764–65.) The relationship between Scott and Naylor was such that since Marchant was a major part of what Scott was doing, he was also a major part of what Naylor was doing. Thus, the evidence is more than sufficient to show that Scott, Naylor, and Marchant were participants in a single conspiracy.

The common goal here is clear: to distribute crack and cocaine. Scott's remarks following Marchant's arrest indicate that Scott and Naylor's operation was largely dependent on Marchant moving their drugs: he was "a major part" of what they were doing. There was overlap both in time and in action between Naylor and Marchant. Scott and Naylor were involved in the conspiracy from 2008 until Scott's arrest in 2010. Marchant joined this conspiracy in January 2009, ending with his arrest in June 2010. Naylor and Marchant were aware of each other's role in the conspiracy and had met before to complete a drug transaction.

Accordingly, there is no variance and Scott's conviction on Count One is affirmed.

9

**B. Whether there was sufficient evidence for the jury to determine that Scott conspired to distribute or possess with the intent to distribute five kilograms or more of cocaine and 280 grams or more of crack.**

### 1. Standard of Review

Where sufficiency of the evidence is challenged, "we examine the totality of the evidence, both direct and circumstantial, and must credit all available inferences in favor of the government." *United States v. Sparrow*, 371 F.3d 851, 852 (3d Cir. 2004) (quoting *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003)) (internal quotation marks omitted).

"We review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)) (internal quotation marks and alterations omitted). Thus, this is a "particularly deferential standard," where we "must be ever vigilant not to usurp the role of the jury by . . . assigning weight to the evidence, or by substituting our judgment for that of the jury." *Id.* (quoting *Brodie*, 403 F.3d at 133) (internal quotation marks and alterations omitted).

### 2. Discussion

The evidence clearly supports the jury's finding that Scott conspired to distribute or possess with the intent to distribute five kilograms or more of cocaine and 280 grams or more of crack. Marchant's testimony alone supports this conclusion.

Marchant began dealing with Scott in February 2009 and continued until his arrest on June 2, 2010. The last known sale was on May 7, 2010. Marchant testified that at his

10

first meeting with Scott, he purchased 62 grams of powder cocaine and 62 grams of crack. (App. 520.) After this initial sale, Marchant testified that he regularly purchased drugs from Scott once a week. (App. 524–25.) Marchant stated that it was "pretty much guarantee[d]" that he would meet with Scott for a drug transaction on a weekly basis. (App. 526.) For these transactions, Marchant would purchase his standing order of 126 grams of powder cocaine and 62 grams of crack. (App. 525.) Based on their weekly schedule, a rational juror could infer that there were approximately 66 subsequent purchases in this time period between Scott and Marchant. Following this inference, a rational jury could conclude that Scott sold Marchant 66 orders of 126 grams of powder cocaine and 62 grams of crack following their initial transaction, which amounts to 8,316 grams of powder cocaine and 4,092 grams of crack—well over the jury's requisite finding for conviction of five kilograms (5000 grams) of cocaine and 280 grams of crack.

While we recognize that Marchant testified that there were times when he would go a week without seeing Scott and that sometimes his order varied, we reiterate that we view the record in the light *most favorable to the government* under a particularly deferential standard: as long as the jury's conclusion passes the bare rationality test, i.e., it is not completely irrational, we must uphold the jury's verdict. The jury's verdict clearly passed this threshold here. Accordingly, we will again affirm the verdict as to Count One.

**C. Whether there was sufficient evidence to prove that Scott possessed a firearm in furtherance of a drug trafficking activity.**

  **1. Standard of Review**

11

We exercise the same standard of review as exercised under Section B *supra*.

**2. Discussion**

Scott alleges that the evidence is insufficient to establish that the firearm recovered from the Everhart Road apartment was possessed in furtherance of a drug trafficking offense. It is Scott's contention that the conviction in Count Ten was based solely on facts showing that Scott was merely a drug dealer in possession of a firearm and that there was no evidence demonstrating that the firearm was used to advance or promote his drug dealing activities. We disagree.

We do, however, agree that, under 18 U.S.C. § 924(c), the "mere presence" of a gun is insufficient to sustain a conviction. *Sparrow*, 371 F.3d at 853. Instead, "the evidence must demonstrate that possession of the firearm advanced or helped forward a drug trafficking crime." *Id.* (citing *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002)). Courts are to consider the following factors in determining whether a firearm advanced a drug trafficking crime:

> [T]he type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.

*Id.* (quoting *United States v. Ceballos-Torres*, 218 F.3d 409, 414–15 (5th Cir. 2000)).

This case is strikingly similar to *United States v. Sparrow*, in which the appellant also challenged the sufficiency of the evidence. *Id.* at 852. There, as here, we rejected that challenge. *See id.* at 852, 854. In *Sparrow*, the appellant sold marijuana out of a convenience store. *Id.* at 851. After conducting surveillance of the store, the police

12

obtained a search warrant and found "a concealed compartment under the floor tiles behind the counter." *Id.* Concealed in the compartment were "nine large Ziploc bags of marijuana, $140 in cash and a loaded Jennings .22 caliber pistol." *Id.* at 851–52. The appellant did not deny possession of the gun. *Id.* at 852.

We held that the evidence was sufficient to sustain possession of a firearm in furtherance of a drug-related activity predominantly because: (1) the appellant illegally possessed the firearm, as a prior felon; (2) the firearm was loaded; (3) the firearm was "kept in the same floor compartment as nine large Ziploc bags of marijuana and $140 in cash"; and (4) while not necessarily easily accessible, the firearm was "strategically located." *Id.* at 854.

Scott is also a prior felon and kept the loaded gun in a dresser with a substantial amount of crack and marijuana, jewelry, and $29,689 in cash. Specifically, the firearm was found in the space underneath the bottom drawer of the dresser where the jewelry and much of the cash was found. In *Sparrow*, we found that the firearm "was placed so that it would be immediately available for [the appellant's] protection whenever he retrieved drugs or money from the floor compartment. Therefore, it [was] reasonable to assume the firearm was placed in the floor compartment for that purpose and was possessed in furtherance of [the appellant's] drug activities." *Id.* The same reasoning applies here. Accordingly, the District Court did not err in finding that Scott possessed a firearm in furtherance of a drug trafficking activity.

**D. Whether the District Court erred in admitting into evidence wiretap tapes, which were allegedly sealed in an untimely fashion absent a sufficient excuse to justify the delay.**

13

**1. Factual and Procedural Background**

The government used wiretap recordings of thirteen phone calls between Scott and Marchant from the wiretaps authorized for two of Scott's phones.

Prior to trial, Scott's attorney requested that the government produce all documentation regarding the Title III wiretaps. (App. 51.) In response, the government provided additional discovery and stated that all Title III documentation regarding the wiretaps had been produced, with the exception of inventory notices. (App. 57.) Subsequently, the District Court conducted a hearing on the admissibility of the wiretaps, but ultimately allowed that evidence to be admitted.

After the trial, Scott informed his newly appointed lawyer of his unfulfilled discovery requests, which included the sealing orders for the wiretaps. Significantly, Scott concedes that he did *not* file a pretrial motion to suppress the wiretaps.

Proceeding pro se, Scott filed a post-trial motion to compel discovery and requested an evidentiary hearing on that motion. He argued that "the wiretap sealing orders had never been disclosed and that the [D]istrict [C]ourt erred in admitting the wiretap recordings without knowing if they were properly sealed." (Appellant Br. 54.) In response, the government conceded a discovery violation because it had not produced the wiretap sealing orders as requested. However, the government contended that Scott suffered no prejudice from this violation because the wiretap disks were, in fact, properly sealed.

14

On July 2, 2013, the government sent the sealing orders to Scott's standby counsel by e-mail. However, on August 2, 2013, the government learned that standby counsel was unable to forward the e-mail to Scott because Scott was then in custody at the Federal Detention Center. Consequently, the information was hand-delivered to Scott. Thus, prior to sentencing on August 8, 2013, Scott had possession of the sealing orders for about a week. However, he did not file a motion to suppress the wiretaps before sentencing or make an oral motion to suppress at sentencing.

After a post-trial hearing, the District Court denied Scott's motion for further discovery and for an evidentiary hearing on the wiretap sealing issue. Scott now appears to make two distinct claims of error pertaining to that issue. First, Scott contends that the District Court erred because the "wiretaps and all evidence derived therefrom should have been suppressed." (Appellant Br. 59.) Second, it is Scott's contention on appeal that "the [D]istrict [C]ourt erred by not conducting a full evidentiary hearing on the sealing issue where such a hearing would have revealed that the wiretaps were sealed in an untimely fashion with no sufficient excuse to justify the delay." (Appellant Br. 55.)

## 2. Waiver

The government correctly argues that any claim of error arising from the failure to timely pursue suppression of this evidence has been waived.

Fed. R. Crim. Pro. 12(b)(3)(C) provides that a motion to suppress evidence "must be raised by pretrial motion if the basis for the motion is then reasonably available . . . ."

This Court has held that, under Fed. R. Crim. Pro. 12(b)(3)(C), "a suppression argument raised for the first time on appeal is waived . . . absent good cause."[5] *United States v. Rose*, 538 F.3d 175, 182 (3d Cir. 2008). "This rule applies not only when defendants altogether fail to raise any suppression arguments in the District Court, but also when defendants fail to raise particular arguments later advanced on appeal." *United States v. Joseph*, 730 F.3d 336, 338 (3d Cir. 2013).

As previously noted, Scott was not sent the sealing orders until after trial and after his conviction. On May 17, 2013, when Scott filed a motion for new trial, Scott defended his failure to file a motion to suppress, stating: "How could the defense file a motion to suppress Scott[']s [wiretaps] on sealing and inventory grounds if the prosecution has never turned over proof of the actual seal or the inventory letters/notices[?] Or at least a written explanation of [their] absence[?]"[6] (Suppl. App. 2.) As Scott did not have the sealing orders in his possession before trial, the basis for the motion was not "reasonably available" to him, and we find good cause for Scott not making a pre-trial motion to suppress.

However, Scott received the sealing orders approximately a week prior to his sentencing on August 8, 2013. It is uncontested that Scott did not file a motion to suppress the wiretaps between receiving them and his sentencing, nor did he make an oral

---

[5] While "*Rose* concerned evidence which the defendant sought to suppress under the Fourth Amendment[,] . . . in light of the expansive language of Rule 12(b)(3)(C), which applies broadly to 'a motion to suppress,'" this Court has found it "equally appropriate to apply this waiver rule in the Title III context." *United States v. Berrios*, 676 F.3d 118, 130 (3d Cir. 2012).

[6] Further, Scott contends that, if the evidence was disclosed before trial, "the defense would have moved to suppress these surveillances." (Suppl. App. 8.)

motion to suppress the wiretaps at sentencing. Thus, we must determine whether there is good cause for Scott's failure to file a motion to suppress the wiretaps once the sealing orders were in his possession.

On the motions hearing on August 8, 2013, while a motion to suppress was not filed, Scott did raise a suppression argument, thus making the District Court aware of the suppression issue. Scott argued:

> [I]f my wiretaps were suppressed, it would have had an effect on the trial. It would have an effect on the evidence seized from the apartment . . . if these wiretaps were suppressed and there was never any motion to file suppressing the wiretaps. Now that I have the sealing orders, there is discrepancy issues in the sealing orders and if the wiretaps were suppressed it would have had a determination on the guilt or innocence for the trial.

(App. 1341.)

In response, the District Court stated: "*You can make the motion*, but there's more than just the fact that they weren't sealed that would reflect upon whether or not they would have been suppressed. So your argument at this point is merely speculative." (App. 1342) (emphasis added). Scott thus replied: "The reason this is speculative is that I didn't have it before trial to file a motion to suppress on it." (App. 1344.) Further, he stated: "If I would have had the evidence when I requested it, your Honor, your Honor could have made the decision before trial when it was requested to grant or deny the suppression of the wiretaps. There was never a motion to file." (*Id.*)

The District Court explicitly told Scott that he "c[ould] make the motion." Nonetheless, Scott never made the motion to suppress. Thus, with the District Court's prompting to make the motion and his possession of the sealing orders, Scott has not

17

shown good cause for not making the motion to suppress. Thus, we will not consider whether the wiretaps and all evidence derived from them should have been suppressed.

Further, we will not consider whether an evidentiary hearing should have been held on the motion to suppress.

"We review for abuse of discretion a district court's denial of an evidentiary hearing on a motion to suppress." *United States v. Hines*, 628 F.3d 101, 104 (3d Cir. 2010). "Such rulings are ordinarily committed to a district court's sound discretion, which we reverse only in rare circumstances." *Id.* at 105.

> Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure permits defendants to file 'motions to suppress evidence' before trial, but evidentiary hearings on such motions are not granted as a matter of course. To require a hearing, a suppression motion must raise issues of fact material to the resolution of the defendant's constitutional claim. A motion to suppress requires an evidentiary hearing only if the motion is sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress.

*Id.* (internal quotation marks and citations omitted). Accordingly, since Scott never actually moved to suppress—despite being prompted to do so by the court—we do not find that the District Court abused its discretion in failing to provide an evidentiary hearing.

**E. Whether the government's failure to provide Scott with the complete criminal history of one of its primary witnesses, Darryl Naylor, constituted a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963).**

    **1. Standard of Review**

18

"Because a *Brady* claim presents questions of law as well as questions of fact, we [ ] conduct a de novo review of the district court's conclusions of law as well as a 'clearly erroneous' review of any findings of fact where appropriate." *United States v. Perdomo*, 929 F.2d 967, 969 (3d Cir. 1991) (citing *Carter v. Rafferty*, 826 F.2d 1299, 1306 (3d Cir. 1987)).

**2. Discussion**

Naylor was a key witness for the government at trial. The following impeachment evidence for Naylor was available to the defense prior to, or before the end of trial:

- Three prior drug trafficking convictions
- Three prior drug convictions, two for distribution and one for possession
- Two arrests for selling drugs to a confidential informant
- Pending federal drug charges
- A theft conviction
- A recent DUI conviction
- Recent possession of cocaine (never charged)

At trial, Naylor also disclosed that he was a drug addict, had served time in prison, had problems with alcohol abuse, and other evidence that certainly allowed Scott to impeach his testimony.

After trial, the government received Naylor's PSR and learned that Naylor had a more extensive criminal record than had been disclosed at or before trial. The following impeaching information about Naylor was thus only discovered after trial:

- Four drug trafficking charges, rather than three
- Three possession charges, rather than one
- Two theft convictions, rather than one
- Two DUI convictions, rather than one
- A burglary conviction
- Three conspiracy charges

19

Scott "contends that Naylor's undisclosed criminal history was material to his defense and that its non-disclosure prejudiced his trial by limiting trial counsel's ability to adequately cross-examine Naylor." (Appellant Br. 61.) However, at sentencing, while Scott was proceeding pro se, he stated:

> There were other issues I wanted to raise, but I didn't feel that—well, I was advised that in posttrial motions that it would not be proper to raise, some of it was arguments, so I didn't file the issue about Darryl Naylor's criminal history not being turned over or a lot of other things, ineffective assistance or things like that, so more or less these are my post trial motions . . . .

(App. 1365.) The government accordingly argues that, "[b]ecause Scott explicitly waived any issue relating to the late disclosure of parts of Naylor's criminal history, his *Brady* claim is not reviewable . . . ." (Appellee Br. 54.)

In his reply brief, Scott acknowledges this procedural defect, but asks this Court to consider the claim anyway because he was a pro se litigant. We have stated that "we tend to be flexible when applying procedural rules to pro se litigants . . . ." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013). "And at least on one occasion, we have refused to apply the doctrine of appellate waiver when dealing with a pro se litigant." *Id.* (citing *Tabron v. Grace*, 6 F.3d 147, 153 n.2 (3d Cir. 1993)). However, we need not decide whether this leniency should apply here, because the evidence Scott complains of was not material when its value is assessed in context with the information that Scott did have at his disposal

> The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state. Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly

20

corroborated is generally not considered material for *Brady* purposes. Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration.

*Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) (internal quotation marks and citations omitted).

Impeachment evidence falls squarely within the *Brady* rule. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). "Suppressed impeachment evidence is immaterial under *Brady*, however, if the evidence is cumulative or impeaches on a collateral issue." *Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005) (citing *United States v. Dumas*, 207 F.3d 11, 16 (1st Cir. 2000)). "Suppressed impeachment evidence, if cumulative of *similar* impeachment evidence used at trial (or available to the [defendant] but not used) is superfluous and therefore has little, if any, probative value." *Id.* (citing *United States v. Boyd*, 55 F.3d 239, 246 (7th Cir. 1995)).

The government argues that "Naylor was already substantially impeached at trial. The jury heard that Naylor had a long and sordid history of drug dealing, drug use, and theft." (Appellee Br. 57.) Further, "[t]he jurors knew that Naylor's history was thoroughly unsavory, and that he was cooperating to gain a benefit for himself, and they believed him anyway." (Appellee Br. 57–58.) We agree. Accordingly, regardless of whether the *Brady* claim was waived by Scott, he cannot establish a violation on this record.

### III.

Accordingly, for all of the above reasons, we will affirm.